**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **SAMANTHA MATTISON,** | |
| **Plaintiff,** | |
| **v.** | Case No. 4:25-cv-04428 |
| **REVIVE RX, LLC,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

### PLAINTIFF SAMANTHA MATTISON'S FIRST AMENDED COMPLAINT

1.      Defendant Revive RX, LLC ("Revive")'s illegal activities and blatant disregard for federal laws and regulations is rampant. So rampant and flagrant, that Revive has decided it is more profitable to fire employees who object to its illegal activities so that it can keep on endangering lives, than it is to reform its conduct to the law. Revive's illegal activity includes deliberately evading state licensing requirements by shipping drugs to legal agents and third-party warehouses located in states where the pharmacy is not licensed so that the drugs could be surreptitiously repackaged and delivered locally to patients. This practice is just one of the many illegal activities observed by Mattison and complained of, but it is emblematic of Revive's ethos and disregard for patient safety. As a result of her objection to Revive's ongoing and flagrant conduct, she was fired.

2.      Samantha Mattison ("Mattison") files this first amended complaint against Revive, seeking damages for its wrongful termination of her for her refusal to perform illegal activities, including (in addition to the above) submitting materially false statements and representations to the Food and Drug Administration ("FDA") and producing adulterated drugs in violation of the

1

Federal Food, Drug, and Cosmetic Act ("FDCA"), retaliatory denial of a promised promotion under the False Claims Act ("FCA"), intentional infliction of emotional distress, tortious interference with prospective business opportunities, and defamation.

## I.  PARTIES

3.      Mattison, who previously worked at Revive as its Senior Director of Quality, is a citizen of Georgia. Mattison is a citizen of Georgia who currently resides at 303 Eagle Rock Drive, Acworth, Georgia in Paulding County. Mattison has maintained this residence since May 2025. Mattison holds a current and valid Georgia Driver's License and has surrendered any previous license from other states. Mattison's family resides with her in Georgia. While Mattison previously resided in Texas and in the past paid taxes as a Texas resident, she has moved to Georgia and intends to live in the state indefinitely.

4.      Revive is a compounding pharmacy business and a limited liability company with its principal place of business in Houston, Texas. Revive's members are Aaron Schneider and Brigham Buhler, both of whom are citizens of Texas.

## II.  JURISDICTION AND VENUE

5.      Mattison alleges a retaliation claim under the False Claims Act, 31 U.S.C. § 3730(h). This Court has jurisdiction over this claim because it arises under a federal statute.  U.S. Const. Art. 3, § 2; 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Mattison's state law claims because those state law claims are so related to the claim in this action which is within this Court's original jurisdiction that they form a part of the same case or controversy under Article III of the United States Constitution. *See* 28 U.S.C. § 1367.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there exists complete diversity of citizenship between the parties and the amount

in controversy exceeds $75,000. Specifically, Mattison seeks to recover from Revive significant compensation for back pay, front pay, interest, lost benefits, fees, costs, and compensatory and punitive damages that will, on information and belief, far exceed $75,000 in compensation, damages, and fees.

7.      This Court has personal jurisdiction over Revive because it is a limited liability company organized under the laws of Texas and maintains its principal place of business in Texas.

8.      Venue is proper in this Court because Revive resides in Houston, Texas, and a substantial part of the events giving rise to the claims in this matter occurred in Houston, Texas.

## III.  FACTUAL BACKGROUND

### A.  The 503A Compounding Pharmaceutical Industry

9.      Compounding is the process of creating a custom medication with FDA-approved ingredients for a compounded drug that is not FDA-approved. Compounding is a crucial service for patients who cannot use commercially available medications, including patients who have allergies to ingredients in standard drugs, difficulties ingesting certain forms of drugs, need multiple drugs combined into a single dose to simplify treatment, or need a re-created drug that has been discontinued or is in shortage.

10.      Revive is a 503A compounding pharmacy, which is a licensed pharmacy that dispenses custom-compounded medications based on patient-specific prescriptions.

11.      Section 503A of the Federal Food, Drug, and Cosmetic Act ("FDCA") outlines the conditions under which human drug compounding by licensed pharmacists and physicians is permitted. *See* 21 U.S.C. § 353a.

12.     Most state boards of pharmacy, including the Texas Board of Pharmacy, require 503A compounding pharmacies to comply with the United States Pharmacopeia ("USP") and other guidelines.

13.     The USP establishes public standards for the identity, strength, quality, and purity of medications, dietary supplements, and food ingredients.

14.     The USP is used to ensure the quality, safety, and efficacy of compounded drugs and drug preparations primarily through two general chapters: General Chapter <795> for non-sterile preparations and General Chapter <797> for sterile preparations.

15.     503A pharmacies like Revive must comply with USP <795> for non-sterile preparations, <797> for sterile preparations, and  <800> for the safe handling of hazardous drugs.

16.     USP <795> requires that all personnel involved in non-sterile compounding preparations be properly trained and demonstrate competency in their work, outlines requirements for the compounding area to be clean and sanitized to prevent contamination, sets standards for the equipment used in compounding, requires that pharmacists create and maintain detailed records, and mandates inspections to ensure quality control.

17.     USP <797> requires for sterile compounding preparations the use of aseptic techniques, which include a series of practices designed to maintain the sterility of the compounded product, environmental controls to create a clean environment, including cleanrooms with specialized air handling systems for air pressure, temperature, humidity control, and particle counts and regular environmental monitoring to test for microbes, training and competency assessment for personnel, and quality assurance including detailed documentation of the compounding process for every preparation, investigations, and out of specification results.

18.     USP <797> requires 503A pharmacies to perform environmental monitoring every six months, which includes tests, assays, and measurements used in controlled environments to detect events, trends, or changes in viable microbial flora (i.e., counts, types), total particle counts, temperature, differential pressure, and humidity.  To comply with USP <797>, the pharmacy's quality improvement plans must examine trends in environmental monitoring to assess and investigate risks, ensuring active improvement rather than mere compliance checks and passive form-filling.

19.     USP <800> provides standards for the handling of hazardous drugs (both sterile and non-sterile) to promote patient safety, worker safety, and environmental protection from exposure to hazardous drugs. Such standards include proper primary engineering controls ("PECs") and secondary engineering controls ("SECs") to contain hazardous drugs, training and demonstrated competency for all personnel handling hazardous drugs, appropriate personal protective equipment ("PPE"), guidelines for receiving, storing, compounding and dispensing, and documentation.

20.     503A pharmacies must follow Section 501(a)(2)(A) of the FDCA which prohibits the production of adulterated drugs, which are defined as being "prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 351(a)(1).

21.     503A pharmacies are prohibited from committing a list of acts outlined in 21 U.S. Code § 331, such as introducing into interstate commerce any adulterated drug.

22.     Independent contractors utilized by 503A pharmacies are considered extensions of the pharmacy, which must ensure that the contractor's methods, results, and impact on product comply with the FDCA. *See* 21 C.F.R. § 200.10(b).

23.     503A pharmacies must perform environmental monitoring and implement corrective actions when monitoring data indicates the drug production environment has been compromised, to prevent the production and distribution of adulterated products.  Corrective actions should be implemented using quality investigation tools, such as root cause analysis documents and risk assessments.

24.     The FDA, as the primary agency responsible for administering the FDCA, is statutorily empowered to enforce the Act.

25.     The FDA coordinates with the Department of Justice (DOJ) to enforce the FDCA through product seizures, injunctions, civil penalty proceedings, and criminal prosecution.

26.     The FDA can inspect 503A pharmacies and, if a compounded drug violates section 503A of the FDCA, the responsible party may be subject to a warning letter, product seizure, recall, injunction, or even criminal prosecution. *See* 21 U.S.C. §§ 331-334.

27.     Texas, and every other state, requires a pharmacy to be licensed in that state in order to sell drugs within the state. *See, e.g.* Texas Occupations Code, Chapter 560, Section 560.001; Fla. Stat. § 465.015.

**B.  Revive's False Assurances of Regulatory Compliance**

28.     Revive promotes itself as a "leading licensed mail-order pharmacy" making and distributing "expertly crafted" compounded drugs made in "USP-certified clean rooms at [its] Houston headquarters, ensuring the highest quality standards."[1]

29.     Revive purports to "uphold strict quality standards in the industry, including medications undergoing rigorous testing for potency, sterility, and accuracy, . . . deliver[ing] confidence in every dose."[2]

---

[1] https://reviverx.com/ (last visited Nov. 4, 2025).
[2] *Id.*

6

30.     However, actions speak louder than words.  For example, Revive received an FDA warning letter in April 2023 for producing misbranded and adulterated drug products, resulting in an FDA Class I recall for certain vials of testosterone cypionate that Revive distributed after they were mislabeled and contained a different medication.

31.     Revive has received at least two FDA Form 483 documents listing inspectional observations made by FDA investigators who noted conditions or practices that may constitute violations of the FDCA, including inadequate sterilization processes, unsanitary conditions and air quality, deficient environmental and personnel monitoring, use of non-pharmaceutical grade components, and production of unapproved and misbranded drugs.

32.     Revive has received at least one Texas State Board of Pharmacy Inspection Report listing unsatisfactory findings regarding a failure to maintain its cleanroom's temperature and humidity within the required range.

33.     Revive has also flouted state-licensing requirements by delivering drugs to patients within states that it is not licensed.

**C. Revive Aggressively Recruits Mattison as Senior Director of Quality with Assurances and Promises of Guaranteed Promotions**

34.     Mattison has a Doctor of Pharmacy from the University at Buffalo and is a New York licensed pharmacist. She has over 10 years of experience in the compounding industry.

35.     In 2024, Revive aggressively recruited Mattison to accept a position as Senior Director of Quality at the company.

36.     Revive's then-Chief Quality Officer, Lawrence Bonk, communicated extensively with Mattison and repeatedly assured her that he would retire within a year and wanted to train her as his replacement.

37.     Revive was aware that Mattison's family lived in Georgia at the time and assured Mattison that she would have flexibility for routine travel to Georgia with approval for remote work during the "training and transition period" prior to Bonk's retirement.

38.     During a meeting with Wil-Jeanne Eugene (Revive's VP of Human Resources and an attorney) and Paul Hoelscher (Revive's then-CEO) about salary and benefits, Hoelscher indicated that Bonk's transition out of Revive (and Mattison's subsequent promotion) would be expedited.

39.     Revive promised Mattison that she could negotiate (and should expect) an increased salary when she transitioned into Bonk's position since her role as Senior Director of Quality would be temporary.

40.     Relying on these repeated assurances of the promotional opportunity, Mattison made plans to accept the Senior Director of Quality position, and then, once promoted, relocate her family from Georgia to Texas. Mattison leased an apartment in Houston so she could be onsite at Revive's Houston facility.

41.     Arreiva McBride (Revive's VP of Operations) and Bonk permitted Mattison to work remotely from Georgia with pre-approval.

42.     Despite the pre-approved remote work from Georgia, Mattison was always present at Revive's Houston facility when required.

**D. Mattison's Initial Start at Revive Foreshadowed the Company's Internal Dysfunctions and Fraud.**

43.     After Mattison's arrival, Revive replaced its then-CEO, Paul Hoelscher, with Schneider.

44.     Shortly after her arrival, during an offsite leadership and planning session for senior leadership, Mattison learned from Reed Hoelscher (Paul Hoelscher's son) that Revive was

experiencing significant challenges with state board of pharmacy renewing the company's licenses due to compliance issues. Mattison quickly discovered that Revive had a deficient system for handling customer and patient complaints; specifically, calls related to product quality were improperly funneled to pharmacists within the call center team instead of the Quality or Compliance teams, resulting in inadequate formal documentation and unresolved safety concerns.

45.    Due to these operational practices, the Quality team was frequently excluded from several patient complaint calls, resulting in insufficient reporting and a failure to conduct proper investigations. Mattison was actively working to rewrite policies and procedures to ensure the compliant handling of patient complaints and suspected adverse events. She specifically trained a Quality Assurance pharmacist on these compliance expectations. Mattison's revisions mandated formal documentation for every complaint and required an internal triage system involving both Quality and Compliance teams. This was intended to prevent Sales or Customer Service teams from making isolated decisions related to patient safety. However, when trying to enforce this formal documentation, Mattison received significant pushback from Revive in the form of delays to meeting requests and internal documentation reviews.

46.    Because Revive failed to adequately address patient concerns, patients began reporting adverse events and drug side effects directly to state boards of pharmacy. These unresolved patient safety complaints triggered investigations that in turn delayed Revive's state license renewals to ship medications and drugs to customers.

47.    With its ability to legally ship certain compounded drugs directly into those states blocked, Revive implemented an unlawful "loophole" using PAK mailing to circumvent state licensure issues—a practice later confirmed by Buhler during a meeting with Mattison in Austin. Mattison learned that this scheme involved shipping drugs to legal agents and third-party

9

warehouses in the unlicensed state (via PAK Mail) and the medication was subsequently shipped locally to the patient. Mattison informed Buhler and Revive leadership that shipping and storing products in unknown locations under unknown conditions instead of sending to the patient directly would result in shipping adulterated drug products to customers. Mattison explained that it was illegal to ship these adulterated drugs to patients who believed they were receiving legitimate medication for which they would in turn seek government reimbursement. The government authorizes reimbursement to patients who receive Revive medications because Revive certifies that it is properly licensed and its products meet all statutory and regulatory compliance standards.

48.    This deceptive practice was a knowing attempt by Revive to avoid compliance with state licensing requirements and public safety regulations that prohibit shipping drugs directly from Texas without a valid license and delivering adulterated drugs to patients.

49.    Revive's former CEO has also confirmed that Revive's founder Aaron Schneider had instructed the Revive sales team to use PAK mailing because it was "an acceptable behavior to ship" controlled-substances into states where Revive was not licensed. This was a practice directed by Revive's leadership and replicated in many of the states in which Revive was not licensed. Florida regulatory authorities identified that Revive had been illegally shipping pharmaceutical products into the state and provided notice to Revive. This spurred an internal investigation by Revive into the practice which Mattison had already objected.[3]

50.    As she would later discover, Mattison's efforts to resolve the license renewal crisis would put a bullseye on her back. Revive had no interest in correcting the licensing issue but

---

[3] Mattison is not the only Revive employee which objected to this illegal practice and was later "run off." Revive's CEO learned from another employee that Schneider had directed the practice and as a result, the employee faced anger, dislike, and retaliation from Schneider. Ultimately, the CEO reported that Schneider had decided that because of the employee's statements, Schneider "was going to try to find a way to run [the employee] off." *See Revive RX, LLC v. Reed Hoelscher*, Case No. 3:25-CV-00798-K, ECF No. 100 at 16.

instead would weed out those who refused to be complicit. Nonetheless, to correct the systemic failures causing the delays, Mattison proposed a complete rehaul of Revive's Complaint and Adverse Action Program, including implementing an Adverse Event Program with mandatory proper tracking forms to ensure patient safety issues were formally addressed and documented. This critical initiative was met with resistance from leadership and pharmacists who favored preserving the status quo. In a clear demonstration of its prioritization of avoidance over compliance, Revive ultimately put an inexperienced intern pharmacist in charge of managing all customer complaints, effectively rejecting Mattison's proposed quality and compliance program.

51.     Mattison realized this resistance to compliance and the continued use of the illegal PAK mailing scheme represented the first of many fundamental obstacles she would face in attempting to steer Revive toward regulatory compliance and away from illegal practices that jeopardized patient safety and constituted fraud. At bottom, her refusal to be complicit would be her downfall.

### E.  FDA's Inspection of Revive's Facility in Early 2025

52.     Between January 27, 2025 through February 7, 2025, the FDA conducted an on-site inspection of Revive's facility located at 3831 Golf Drive, Suite A, Houston, Texas 77018.

53.     On the first day of the inspection, Mattison was not onsite because she had been given permission by Revive to work remotely that week in Georgia.

54.     Within a day of her arrival in Georgia, Bonk called Mattison about the inspection, and she immediately returned to Houston to be on-site to support the inspection.

55.     During the inspection, the facility's main and small conference room, where the FDA inspector(s) requested, questioned, and reviewed documents, was internally referred to as the "front room" for each day of the two-week on-site audit.

56.     At the outset of the inspection, Bonk instructed Mattison to stay in the "back room" to support the staff in retrieving and/or preparing documents that would be presented to the FDA inspector(s).

57.     During the investigation, Mattison witnessed on several occasions Bonk coming into the back room and intentionally removing information from internal tracking spreadsheets, such as cleaning logs or other quality documentation about the facility's fungal and mold findings. Information which Mattison knew the FDA would want to see.

58.     Mattison realized Bonk was doing this to avoid presenting that information to the FDA inspector—an observation confirmed by other quality staff who approached Mattison and gave her evidence of original spreadsheets not matching the altered sheets Bonk provided to the FDA inspector(s).

59.     Staff also notified Mattison that Bonk directed them to delete records and information related to breach cleanings and environmental sampling of the cleanroom early in the morning and not to tell her about it. Staff also texted Mattison about their concerns, and she directed them to not falsify records or lie to the FDA.

60.     One employee, who later provided Mattison with documented evidence, was forced by Bonk to write a deviation essentially claiming that samples were inadvertently missed or not collected on the date(s) that breach cleans and subsequent samples with contamination findings were in fact taken.

61.     Mattison found evidence of the original, printed Pestle system records containing comments and timestamps of breach cleans and cleanroom environmental monitoring sampling results done in July 2024, which indicated contamination results with a level documented as "too numerous to count" and images of the test plates listed as an attachment.

62.     Mattison later observed that Revive had completely removed these records from the Pestle software to cover its tracks and avoid detection by the FDA. For example, Mattison learned that Bonk made the production team breach-clean the nonsterile lab, equipment, and space over one weekend, but these records were altered and removed from Pestle during the FDA inspection, presumably to avoid disclosing them to the FDA auditor(s).

63.     Mattison emailed Eugene, McBride, and Aaron Schneider (Revive's co-founder) this information as further proof of Revive lying to the FDA, but they took no responsive, remedial action. Instead, Bonk repeatedly assured Mattison that the leadership was aware of and on board with the deception.

64.     When Mattison expressed concern about falsifying documents presented to the FDA, Bonk stated that he was willing to do whatever it takes to protect his position and the business. To overlook his falsification of documents, Bonk brazenly offered Mattison a $10,000 to $15,000 payment and agreed to expedite hiring a Quality Assurance Manager that Mattison had requested but was previously denied in order to buy Mattison's silence. Mattison refused these illicit offers.

65.     Nonetheless, Bonk repeatedly assured Mattison through multiple phone calls and a text message that ownership was aware of, and indeed endorsed, his actions and handling the inspectional audit. Mattison provided this text message to Revive's human resources to prompt an investigation.

66.     Mattison refused to be complicit in Bonk intentionally hiding, misconstruing, and redacting information that created false representations to the FDA inspector(s). She reported this misconduct to several Revive employees, including but not limited to McBride, Jonathan Rekieta

(Director of Compounding and Pharmacist in Charge), Kim Chukwurah (Director of Compliance), and Lauren Franklin (Quality Assurance Specialist acting as the daily audit scribe).

67.    Mattison also reached out to Revive's leadership, including Co-Founder Schneider, to discuss Bonk's blatant withholding and alteration of damaging information during the FDA inspection. Schneider said he would speak to Mattison the following day, but he did not.

68.    Schneider later instructed Mattison to let Bonk handle the inspection and claimed that intentionally leaving investigations "open" to avoid the need to report adverse results of a documented investigation was not lying but merely "strategy." Mattison, who is experienced in FDA inspections, reiterated that withholding information from the FDA is not a strategy—it is illegal, contravenes industry norms, and risks patient safety.

69.    Mattison also met with Buhler (Revive's co-founder and owner) to discuss the ongoing risks at the facility and inform him of the mold contamination and illegal activities during the FDA Inspection.  She also told him about Schneider and Bonk's purported "strategy" and how it contravened normal industry practice. Industry practice requires that documented investigations be completed within a standard thirty- to sixty-day window but Revive left these investigations "open" for up to and over 12-month periods.

70.    Revive deliberately held these completed investigations "open" (for their records but not in reality) to avoid disclosing the documented investigation as a "closed" matter to the FDA inspector(s). Accordingly, multiple documented investigations remained "open" in Revive's quality files and were not shared with the FDA when requested during the inspection.

71.    For example, at the time of the FDA inspection, an investigation remained "open" about fungal contamination over the current cleanroom (i.e., the only cleanroom through which all of Revive's products passed before distribution to patients at the time).

14

72.     Mattison helped complete an existing investigation into the cleanroom's fungal contamination and emailed it to Bonk and Schneider to review and sign-off. However, Bonk refused to approve the document, keeping the investigation "open" so that it would not be disclosed to the FDA before the inspection concluded.

73.     The contamination originated from trash bags left by construction workers in the plenum space above the cleanroom and resulted in subsequent leaks. Revive employees presented Mattison with photos documenting rodent excrement, potential ceiling mold, and leaks in the cleanroom where pharmacists and technicians continued to produce products purporting to be sterile and in compliance with the USP, FDCA, and other regulations.

74.     The quality control team also repeatedly reported that the cleanroom's temperature and humidity were not in the compliant range for compounding sterile products for patients, as required by USP. Nonetheless, Revive's operation team continued to utilize the room for full production and pressured Mattison and her team to write a risk assessment to justify the use of the room.

75.     At one point, Ken Jamison (Revive's Manager, Safety & Special Projects Coordinator) and Henry Vigil (Revive's Facilities Specialist) presented scope of work bids for full mold remediation of the cleanroom to site leadership, including Schneider, Mattison, and Chukwurah. Two companies submitted proposals to remove all the contaminated insulation and building materials from the plenum space and perform a proper mold remediation treatment and replacement of materials, which would take several months.

76.     Because the mold remediation would result in Revive's only cleanroom being inoperative, and thus stopping product production, Revive's leadership, including McBride, Schneider, and Rekieta, decided not to remediate the mold until an additional cleanroom was

constructed for use, which would also take several months. As a result, upon information and belief, an untold number of potentially contaminated batches of product were knowingly produced in an environment known to be unsterile and uncontrolled for over a year and then distributed by Revive to patients in violation of the USP, FDCA, and other regulations.

77.    Mattison alerted site leadership to the high risk to patient safety caused by mold contamination above the company's only cleanroom, an issue compounded by problems with inadequate temperature, humidity levels, and controls that were non-compliant with the USP. Mattison also apprised site leadership of the company's improper attempt to hide the contamination with reports of altered test results and investigations from third-party laboratories.

78.    For example, Mattison found a failed result from container closure integrity testing ("CCIT"), which is used to determine if proper closure seals are maintaining the sterility of a released product. Mattison brought this to the attention of Hoelscher who was upset that Bonk had hidden this result from him.

79.    Mattison also discovered that Revive conducted no investigation of the facility's semi-automatic vial crimping machine to understand the risk level of unsterile vial products being released into the market. Mattison would have recommended a product recall due to the vial crimping machine's failure to create a proper seal to maintain sterility and prevent contamination of Revive's products.  Mattison later found another failed result from a CCIT during a stability study test, which indicated ongoing sterility issues, inadequate controls, and inadequate consistency in sealing Revive's drug vials that were all capped through the same machine prior to distribution.

80.    When Mattison initiated an investigation into failed sterility tests, she discovered that Bonk had interfered with the process and prevented a third-party laboratory from reviewing

the out-of-specification results. Instead, Bonk directed quality control technicians to create sham samples that were manually crimped to pass testing rather than using samples from the actual product line. She later found another failed sterility test during a subsequent stability study she implemented as part of remediation to meet the updated USP 797 standards.

81.     Mattison's concerns, which she raised repeatedly, were not only dismissed by Revive but crystalized the mark on her back.

### F.  FDA Findings and Revive's Response

82.     On February 7, 2025, the agency issued a Form FDA 483 with seven observations of objectionable conditions: (1) sterile drugs and materials were exposed to lower than the International Organization for Standardization ("ISO") Class 5 air quality; (2) microbial contamination was found in the ISO Class 5 area and adjacent production areas; (3) the company lacked adequate routine environmental monitoring in the ISO Class 5 area and classified areas; (4) the company failed to conduct media fill testing that simulated aseptic production operations under the worst-case, most challenging, and stressful conditions; (5) the company failed to perform smoke studies in cleanroom environments under dynamic conditions; (6) the company failed to appropriately and regularly clean, disinfect, or sterilize equipment located in the ISO Class 5 area; and (7) the company failed to routinely sterilize lyophilizers and protect them by sterilizing filters.

83.     Revive tasked Mattison with drafting the company's response to the Form FDA 483 observations and conducting a risk assessment.

84.     Around this time, McBride and Eugene informed Mattison that Bonk was taking an extended leave for personal reasons.

85.    Clearly in retaliation for vocalizing her repeated concerns about defrauding the FDA and government, Revive did not promote Mattison to the title and salary of Chief Quality Officer upon Bonk's departure from Revive, as she had been repeatedly promised.

86.    Instead, Revive kept Mattison in her original position and, then in a clear departure from any industry norm or practice, made her report to McBride, instead of Schneider as Bonk had previously done. Requiring Mattison (head of quality) to report to McBride (head of operations) was a blatant conflict of interest and disapproved of by the FDA and Boards of Pharmacy.

87.    While drafting the response letter and conducting the risk assessment, Mattison received considerable pushback regarding quality control issues in the cleanroom area. Mattison recommended remediation for each of the FDA's observations, such as improving documentation, establishing better standard operating procedures, and implementing quality control for the Class 5, 7, and 8 areas to get into compliance.

88.    Revive instead attempted to circumvent Mattison (and any serious attempt to fix the problems) by hiring an outside consultant, David Eurich from Regulatory Compliance Associates, to conduct an evaluation of the cleanroom area and perform remediation for all microbiology and quality control FDA Form 483 observations.

89.    Mattison quickly found Eurich to be ineffective and uncooperative, as he regularly missed scheduled weekly meetings to discuss remedial steps and was rarely onsite. Eurich was also ineffective as he lacked knowledge of Revive's specific equipment in the cleanroom and the extent of issues that needed to be addressed in the response to the Form FDA 483 observations. Eurich's ineffectiveness in remediating the cleanroom did not appear to be by accident, but instead by Schneider's design.

90.     Drawing on her expertise, Mattison created a comprehensive project plan, including a RACI diagram, to address all seven of the FDA's observations, recommending established guidelines like the Current Good Manufacturing Practices ("cGMPs"). However, her recommendations were largely ignored, as Eurich continued to follow instructions from Schneider instead of Mattison as head of quality.

91.     Despite Revive's stated commitment to the FDA to improve documentation and quality systems, Eurich routinely disregarded Mattison's site-specific templates, using his own generic documents instead. This resulted in inaccurate protocols and a lack of oversight, as evidenced by Eurich's failure to prepare for a microbiology lab evaluation. Consequently, as the 90-day FDA follow-up deadline approached, Eurich could not to provide the necessary evidence of remediation, despite Mattison's escalating reports of concerns.

## G.  Mattison's Wrongful Termination for Refusing to Make False Misrepresentations to the FDA.

92.     As part of demonstrating remediation efforts for the FDA response letter, Revive had to set up a microbiology lab unit evaluation for its Biological Safety Cabinet ("BSC"), which is a specialized equipment designed to provide a safe environment for preparing compounded sterile medications. The BSC is also used to conduct microbiological testing sampling as part of environmental monitoring, which is critical to, among other things, ensure patient safety and a lack of contamination.

93.     Specifically, in its February 7, 2025 Form FDA 483, the FDA observed that the BSC had bacteria (such as Staphylococcus and Actinomyces) growing inside it while sterile drugs were being produced. Revive also did not have proper cleaning process for all parts of the hood, including a process for cleaning the metal diffuser covering the HEPA filters within the BSC used to produce sterile drug products.  An operator was observed also making two different drug

products in the same BSC hood without cleaning the front metal diffuser, leading to potential cross-contamination of the two drugs. As Senior Director of Quality, Mattison was responsible for drafting the 90-day update assessment to the FDA and ensuring the BSC was in compliance, both to properly address the FDA observations and to ensure the production of uncontaminated, unadulterated drugs.

94.    Eurich set up a BSC evaluation for May 30, 2025, without any of the requisite documents, staff trainings, and written and internally approved protocols.

95.    On May 29, 2025, one day before the BSC evaluation was to be conducted, Mattison met with an employee who informed her that they were instructed to go into the cleanroom and apply paint to cover up marks and spots the day before a client was to tour the facility that week. The employee also had photographic evidence of leaks in the cleanroom during active production.

96.    Mattison also met with a pharmacist who expressed concern about a large HVAC vent (connected to the contaminated plenum space above the cleanroom) blowing known contaminated air over the nonsterile lab. The pharmacist had previously observed black spots on troches (a small tablet designed to dissolve slowly when placed under the tongue) in molds in the nonsterile lab. Under Bonk's directive, Revive stopped visually inspecting all nonsterile products—instead of investigating to understand the risk—to overlook such issues necessitating attention. Such coverups likely resulted in Revive releasing potentially contaminated nonsterile products and putting patient safety at risk.

97.    Later that morning, Mattison emailed Eurich, McBride, and Schneider, expressing concerns that Eurich had been unresponsive about the quickly approaching FDA 90-day follow-up letter addressing the remediation efforts.

98.    Mattison also sought to confirm that Eurich would actually be present for the scheduled May 30 on-site BSC evaluation to be conducted by a hired third party. She further explained that conducting the BSC evaluation and Eurich's failure to establish specific protocols and standard operating procedures ("SOPs") would result in fraudulent rubber-stamping of remediation efforts to the FDA, if she submitted the company's response to the Form FDA 483 observations as she had been directed to do. In other words, Mattison would be knowingly submitting false and misleading statements, information, and data to the FDA, which can result in civil monetary penalties and referrals for federal criminal investigation and prosecution.

99.    These reports were the final straw for Schneider as he initially tried to brush aside the issues raised by Mattison, who refused to back down. Instead, she again raised the critical issues with the scheduled BSC service and 90-day update assessment that Revive had directed Mattison to draft, conduct and use to demonstrate purported remediation to the FDA. It was clear that Mattison was refusing to be complicit in illegal activity and Schneider was going to get rid of her.

100.    Faced with the prospect of proceeding with a sham assessment and using it to deceive the FDA, on May 29, 2025, Mattison canceled the May 30 third-party BSC service, meaning she also refused to approve a sham BSC assessment for the company's response to the Form FDA 483 observations based on that service, so she and the site team could draft the committed-to internal protocols, SOPs, and quality system documents as promised to the FDA.

101.    Eurich attempted to overrule Mattison and directed her by email to move forward immediately with the service. Schneider replied by email agreeing with Eurich that a third party should perform the service on a critical piece of equipment with the third party's own documentation, without Eurich's on-site presence, and without sufficient training of Revive's staff

to observe and verify the service actions taking place. In other words, Schneider ordered Mattison to approve and go forward with the May 30 BSC service, knowing that it would result in falsified data that Mattison would have to include in the 90-day FDA update. Mattison again refused to continue with the third-party BSC service and submit falsified data for the 90-day FDA update.

102.     A few hours later, after cancelling the BSC service and confronting Revive about this sham assessment and refusing to go through with it for the 90-day FDA update, Mattison was terminated. Revive terminated Mattison based solely on her repeated refusal to commit illegal activities to defraud the FDA and endanger patients with contaminated, unsterile products. Revive then offered Mattison a severance package in a further effort to silence her and mislead the FDA.

**H.  Revive Sues Mattison to Silence Her.**

103.     Revealing that any purported performance-based termination was pretense, Revive offered Mattison a severance agreement with a general release of claims arising from her employment and termination in exchange for three months of pay. However, that amount did not cause Mattison to remain silent as Revive no doubt hoped it would, as Mattison continued to raise her concerns after she was terminated. Moreover, the amount offered came nowhere close to adequately compensating Mattison.

104.     Mattison had made plans to relocate her family from Georgia to Texas based on Revive's assurances that she would take on Bonk's role. That process caused her to incur expenses that are now worth nothing to her and that she would not have incurred but for Revive's false representations.

105.     Mattison experienced and continues to experience severe emotional distress after witnessing Revive's focus on profits, illegal activities to defraud the FDA, and risk to patient

safety. Mattison experienced a number of symptoms, including but not limited to loss of sleep, anxiety, loss of appetite, vomiting, and increased irritability.

106.    Mattison earnestly tried to negotiate with Revive by sending a demand letter on July 7, 2025, detailing the illicit activities that she witnessed and was instructed to commit.

107.    Revive requested a two-week extension of time to respond, purportedly to "investigate" Mattison's concerns, but in reality Revive misused the extension to file an improper Texas petition for declaratory judgment against Mattison. *See Revive RX, LLC v. Mattison*, Cause No. 2025-50482 (Tex. Dist. Ct., Harris Cnty.). On Mattison's motion, the state court dismissed Revive's petition **with prejudice**, finding it was an improper use of a declaratory judgment action and/or was prohibited by the Anti-SLAPP statute, *i.e.*, the Texas Citizens Participation Act ("TCPA"). The state court also awarded Mattison the costs and attorneys' fees she incurred in defending against this frivolous litigation. After the state court had already dismissed with prejudice, Revive purported to non-suit without prejudice.[4] Revive later withdrew that purported non-suit.

108.    Revive responded to Mattison's letter at 2:26 PM on July 21, 2025 with its original offer set to expire that day. The following day, on July 22, 2025, Revive launched its petition against Mattison to silence her, instilling fear into her and hurling baseless accusations about her work performance to limit her future employment opportunities in the niche compounding pharmacy market.

---

[4] *See Revive RX, LLC v. Mattison*, Cause No. 2025-50482 (Tex. Dist. Ct., Harris Cnty.), Revive's Notice of Non-Suit Without Prejudice ("Revive asserts that it would be inefficient to continue litigating overlapping claims in two separate forums. As such, the most cost and time-efficient avenue for resolution of the parties' dispute is to proceed in federal court, where Mattison has asserted her claims as plaintiff, and Revive still retains the opportunity to assert its additional claims against Mattison as counterclaims, if necessary").

109. Revive has tarnished Mattison's professional reputation such that it will take significant time to get another job in the industry, if that is even possible.

110. The above-referenced illegal conduct by Revive through its supervisors and employees has caused significant injury to Mattison, including but not limited to: (1) lost wages, benefits, and other privileges of employment; (2) pain and suffering; (3) mental anguish; (4) emotional distress; (5) embarrassment; (6) humiliation; (7) loss of enjoyment of life; (8) irreparable damage to her good name and reputation; and (9) irreparable damage to her professional career and future earning potential.

111. At all relevant times, Revive through its supervisors and employees has acted in bad-faith, intentionally, and with malice in retaliating against Mattison, as alleged herein.

## IV. CLAIMS

### COUNT I
### WRONGFUL TERMINATION FOR REFUSAL TO COMMIT AN ILLEGAL ACT
### (*SABINE PILOT* CLAIM)[5]

112. Paragraphs 1 through 81 and Paragraphs 92 through 102 are incorporated and re-alleged herein.

113. Revive is liable for the acts of its supervisors and employees and the damages suffered by Mattison under the principles of respondent superior and agency.

114. Revive's illegal behavior is rampant. From its illegal program designed to ship controlled substances into states in which it was not licensed in violation of the law, to its deliberate and knowing deceit, fraud, and misleading of the FDA—Mattison entered an environment in which she was forced to be complicit in illegal activity or be retaliated against for objecting and refusing.

---

[5] *Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733, 735 (Tex. 1985).

Ultimately, her objections, efforts to correct illegal behavior, and decision to take steps to stop it, resulted in her firing.

115.    Revive ordered and directed Mattison to perform illegal acts, including but not limited to providing false or misleading statements to the FDA, violating the FDCA, and approving quality standards for the production and distribution of adulterated drugs.

116.    Specifically, Revive ordered Mattison to conduct the sham assessment and use it to deceive the FDA and prevented her from using drafted committed-to internal protocols, SOPs, and quality system documents as promised to the FDA.

117.    Such acts violate the law, including but not limited to providing false statements to a federal government agency, 18 U.S.C. § 1001, and violating the FDCA.

118.    The illegal courses of action that Revive directed Mattison to perform carried criminal penalties at all times relevant to this lawsuit.

119.    The FDCA imposes criminal penalties for a range of violations of the Act, potentially carrying up to a $1 million fine and 20 years of federal imprisonment.  21 U.S.C. § 333.

120.    The Federal False Statements Act makes it a crime to knowingly and willfully make false statements, conceal material facts, or submit false documents to the government, including the FDA.  18 U.S.C. § 1001.  Penalties for violations carry up to a $250,000 fine for individuals and 5 years of federal imprisonment.

121.    Prior to her termination, Mattison had no disciplinary issues, never received a performance improvement plan, and was awarded all of her quarterly performance bonus. The sole reason Revive fired her was because she refused to participate in illegal activity. Indeed, after they fired her, the company sought a release from her in exchange for another payoff in the form of a "severance agreement."

122.    Prior to her termination, Mattison met with McBride and Eugene, who told her that several employees had left the company ***not*** because of Mattison's management, but because of Bonk's previous actions of directing them to lie, and to delete and alter records submitted to the FDA.

123.    Revive can offer no legitimate reason for the termination.

124.    The fact that Revive offered Mattison three-months severance pay following her alleged termination for cause demonstrates Revive's malice because it knew her retaliatory firing was unlawful and proceeded with it anyway.

125.    Upon information and belief, Revive has acted with malice by circulating false or malicious rumors about Mattison before or after the discharge to other employees at Revive and other compounding pharmacies.

126.    Upon information and belief, Revive has acted with malice by interfering with the Mattison's ability to find other employment in the compounding pharmacy industry, where she has spent her entire career working in. Indeed, Revive's frivolous lawsuit was filed solely to besmirch, discredit, and smear Mattison in the industry—an action that Revive hoped would silence her.

127.    As a direct and proximate result of Revive's unlawful retaliation as described above, Mattison has suffered, and will in all likelihood continue to suffer, actual damages in the form of lost wages and benefits, both past and future, as well as prejudgment interest.

128.    As a direct and proximate result of Revive's unlawful retaliation as described above, Mattison has suffered, and will in all likelihood continue to suffer into the future, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses. Mattison is thus entitled to an award of compensatory damages.

129.    Revive has committed unlawful retaliatory acts with malice or with reckless indifference to Mattison's state-protected rights. Mattison is thus entitled to an award of punitive damages.

130.    Mattison is entitled to an award of reasonable attorney's fees and costs, incurred in the prosecution of this action, for which she hereby sues.

## COUNT II
## WHISTLEBLOWER RETALIATION (DENIAL OF PROMOTION) UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3730(h))

131.    Paragraphs 1 through 91 are incorporated and re-alleged herein.

132.    Mattison had knowledge of Revive making fraudulent claims to the government.

133.    Mattison engaged in protected activity by reporting Revive's fraudulent and illegal conduct to Revive's leadership.

134.    Specifically, Mattison identified to Revive's leadership that it could not hide or lie about its compliance with regulations and standards and that its false reporting to the FDA regarding intentional removal of fungal and mold data from internal spreadsheets and withholding information from the FDA was illegal and defrauding the government.

135.    Mattison identified that Revive's fraudulent and illegal conduct was particularly concerning because she reasonably believed that (1) Revive was knowingly submitting false reports to the FDA about its quality control records, contamination findings, and cleanroom mold findings, and (2) Revive having patients pay for (and ultimately the government reimburse for) medications likely containing adulterated products or contaminated drugs was fraudulent and illegal. Indeed, submitting claims for adulterated medications or defective products can result in false claims under the False Claims Act. Revive's patients use federal programs (e.g., Tricare, FEHBP, or federal worker benefit plans) which reimburse patients for medications, and Revive

provides necessary documentation, including invoices for drugs purported to be uncontaminated, legitimate, safe, and compliant with all laws, for patients seeking such federal reimbursements, thereby knowingly causing false claims to be made to the federal government. Thus, Revive's manufacture, and distribution of adulterated products has caused violations of the false claims act.

136.    Revive knew that Mattison was engaged in protected activity, as Mattison repeatedly made her concerns about Revive's illegal activity, including but not limited to, contamination, manufacture of adulterated products, and ultimately fraud on the federal government known to Revive's leadership. Revive instead ignored her concerns about the production of contaminated, adulterated products because it was more concerned with its profits. Revive demoted, harassed, and otherwise discriminated against the terms and conditions of Mattison's employment based upon Mattison's explicit objections to Revive's conduct which was causing fraud on the government.

137.    Specifically, following the FDA inspection and voicing her concerns about government fraud, Revive demoted Mattison by forcing her to take on Bonk's role as Chief Quality Officer without the title and compensation as previously promised upon Bonk's leave and/or departure from the company. Revive further demoted Mattison, who was now tasked with overseeing all quality at Revive, by hiring an outside consultant to overrule her authority on remediation efforts to comply with the FDA Form 483 findings and forcing her to report to the head of operations.

138.    By pressuring Mattison to acquiesce to the illegal conduct, Revive also created a hostile and intolerable working environment causing Mattison to experience emotional distress, added pressure and anxiety, additional responsibility without compensation, and a volatile workplace.

139.    Mattison seeks recovery of all damages available to her as a result of Revive's retaliation, including compensatory, special, and, punitive damages, and attorney's fees and litigation costs.

<u>COUNT III</u>
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

140.    Paragraphs 1 through 139 are incorporated and re-alleged herein.

141.    Revive acted with intent or reckless disregard when it repeatedly dismissed Mattison's concerns about the imminent risks to patient safety and deception to the FDA, demoted and humiliated her, retaliated against her for refusal to remain silent about and engage in unlawful activity, wrongfully terminated her for refusal to engage in unlawful activity, and filed its frivolous petition with baseless allegations, causing severe emotional distress to Mattison.

142.    Revive knew its state declaratory judgment petition was frivolous but filed it anyway and sought an award of attorneys' fees, for the purpose of besmirching, belittling, and defaming her in an effort to smear her in the industry. Its frivolous lawsuit was also a transparent attempt to force Mattison to cave under financial pressure and silence her efforts to shine a light on the company's illegal practices. The trial court agreed—dismissing Revive's complaint with prejudice and awarding Mattison her reasonable attorneys' fees and costs for having to have defended against Revive's improper conduct. Revive was not deterred, however, and the day after the court dismissed its complaint with prejudice, it sought to sidestep the consequences of its actions by filing a non-suit without prejudice. It was too little too late--the state court had already rightly ordered Revive to pay Mattison's attorneys' fees incurred in defending against Revive's SLAPP petition. But Revive's intention remains clear—harass, defame and smear Mattison to avoid the consequences of its own conduct.

143.    Revive's conduct was reckless and intentional in that Revive intended the consequences of its act and intended such statements to cause Mattison emotional distress.

144.    Revive engaged in extreme and outrageous conduct by intentionally spreading false statements that were made to Mattison's former co-workers and potential employers, as well as in a public state court filing, all with the purpose of discrediting her and silencing her about what she witnessed and risks to public safety, causing severe emotional harm.

145.    Revive's actions were extreme and outrageous because the company was fully aware of the immense physical and severe emotional toll its conduct was taking on Mattison during her employment.

146.    Aware of the immense distress its actions were causing, Revive continued its coordinated campaign to inflict as much harm as possible on Mattison and her family. This targeted effort was designed to silence her, ruin her career and livelihood.

147.    Revive's conduct proximately caused severe emotional distress to Mattison.

148.    The emotional distress that Mattison suffered is so severe and extreme that it cannot properly be remedied under any other cause of action. Mattison not only suffered her own severe distress, but additional distress as she observed the impact that the conduct had on her now fiancé, children, and other family members. This too was Revive's intent—to cause as much emotional distress as possible by any means.

149.    Revive's wrongful conduct caused the following damages: general damages arising from past pain and suffering and past mental anguish and special damages arising from a loss of past earning capacity.

150.    Mattison has suffered damages more than $250,000.00, including suffering severe emotional distress such as post-traumatic stress disorder, increased anxiety, sleeplessness, mental

distraction, loss of appetite, vomiting, despair, frustration, anger, and other associated symptoms. She has suffered economic damages in the form of lost business opportunities and wages in an amount to be proven at trial. She was also forced to leave her employer, Revive, and lost substantial income therefrom. She has suffered extreme anxiety related the impact on her career. She has also been forced to retain counsel and defend against Revive's frivolous claims.

151.    Mattison seeks recovery of all relief available to her as a result of Revive's actions, including compensatory and punitive damages, equitable remedies, and attorney's fees and litigation costs.

### COUNT IV
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

152.    Paragraphs 1 through 111 are incorporated and re-alleged herein.

153.    Since her termination, Mattison had a reasonable probability of entering into new business relationships and securing new employment opportunities in the compounding pharmacy industry. Her professional qualifications, experience, and excellent reputation prior to Revive's actions created this reasonable probability.

154.    Upon information and belief, Revive is aware that Mattison is seeking employment following her wrongful termination from the company and is acting with a conscious desire to prevent Mattison from obtaining new employment by disparaging Mattison to other companies in the niche market of the compounding pharmacy industry.

155.    Upon information and belief, Revive's leadership, specifically Schneider and Buhler, have falsely told prospective employers and compound pharmacy industry leaders that Mattison was terminated for poor performance, being disinterested in her job, and caused former Revive employees to quit. Schneider's regular monitoring of Mattison's LinkedIn profile to this day leads her to believe that he will continue to interfere with any future employment.

31

156.    Revive filed a public state declaratory judgment petition which included the unfounded accusations listed above. Upon information and belief, Revive has repeated those unfounded accusations in the marketplace, which has further impacted Mattison's ability to obtain new employment.

157.    Revive's badmouthing, disparaging statements, and the filing of a baseless public lawsuit against Mattison constitute independent, malicious, and unlawful acts. These acts were not a legitimate exercise of Revive's rights but were undertaken with the specific and malicious intent to harm Mattison. The statements contained in the lawsuit and, upon information and belief, repeated outside litigation by Revive are false and defamatory.

158.    Revive's wrongful termination and petition have proximately caused Mattison to lose out on jobs.

159.    Revive knew or should have known that Mattison was actively seeking new employment and that its actions would interfere with her ability to secure a new position.

160.    Revive's interference caused actual injury to Mattison. Despite her doctorate education and background, including being a Senior Director of Quality at a high-profile compounding pharmacy, she has been unable to secure new employment (even for jobs she is overqualified for), resulting in a loss of income and benefits. Furthermore, she has suffered extensive damage to her professional reputation, humiliation, and severe mental anguish.

161.    Revive has committed unlawful retaliatory acts with malice or with reckless indifference to Mattison's state-protected rights. Mattison is thus entitled to an award of punitive damages.

162.    Revive's tortious interference conduct was willful, malicious, and wrongful, entitling Mattison to exemplary damages.

163.    Mattison seeks recovery of all relief available to her as a result of Revive's actions, including compensatory and punitive damages, equitable remedies including injunctive relief, and attorney's fees and litigation costs.

## COUNT V
## DEFAMATION

164.    Paragraphs 1 through 111 are incorporated and re-alleged herein.

165.    Upon information and belief, outside the context of litigation, Revive (including Bringham and Schnieder) has shared the contents of its groundless petition for declaratory judgment and also repeated false statements attacking her professional honesty and integrity to third parties, including prospective employers and recruiters, essentially professionally blacklisting her within the small, specialized compounding pharmacy industry.

166.    Prior to her termination in May 2025, Mattison maintained a strong professional network and received frequent inquiries regarding potential consulting projects from colleagues and industry contacts.

167.    These professional relationships and opportunities have ceased abruptly and entirely since her departure from Revive in May 2025. Several contacts who had previously discussed specific, ongoing consulting projects with Mattison have since become unresponsive to her emails.

168.    This sudden and complete cessation of communication from industry colleagues, many of whom are part of the same professional organizations as Revive's leadership, indicates that Revive has taken action to intentionally damage Mattison's professional reputation, including spreading information about her purported poor management that allegedly led five former Revive employees to quit.

169.    Given the close-knit nature of the compounding pharmacy industry, Revive's false and defamatory statements have effectively barred Mattison from securing new employment and/or consulting opportunities.

170.    These false statements have injured Mattison in her profession or occupation by discrediting her professional reputation in the compounding pharmacy industry.

171.    Upon information and belief, Revive, including Schneider and Buhler, has acted with negligence and/or actual malice in sharing false information about Mattison to third parties orally and in writing to expose Mattison to public hatred, contempt, ridicule, and financial injury.

172.    Revive acted with a conscious desire to prevent Mattison from obtaining new employment and to blacklist her from the compounding industry.

173.    Mattison has suffered injury to her reputation in her profession, in the compounding industry, and the pharmacy space.

174.    The professional harm is not hypothetical but is directly alleged as a tangible impediment to future employment and ability to network in her specialized field.

175.    Mattison seeks all relief available to her as a result of Revive's actions, including compensatory and punitive damages, equitable remedies, and attorney's fees and litigation costs.

### V.  **JURY DEMAND**

176.    Mattison demands a jury trial.

### VI.  **RESERVATION OF RIGHTS**

177.    Mattison specifically reserves the right to bring additional causes of action against Revive and to amend her claims as necessary.

### VII.  **PRAYER FOR RELIEF**

178.    WHEREFORE, Plaintiff Mattison prays and requests Defendant Revive be cited to appear and answer and that on final trial, Plaintiff have the following, in an amount to be proven at trial or another appropriate time:

      a.  Judgment against Revive for all compensatory damages, including economic and non-economic damages, and exemplary damages,

      b.  Reasonable and actual attorneys' fees,

      c.  Pre-judgment and post-judgment interest as provided by law,

      d.  Costs of court, and

      e.  Other relief, general and special, legal and equitable, to which Mattison may be justly entitled.

Respectfully submitted this 6th day of November, 2025.

*/s/ Aaron A. Wagner*
Aaron A. Wagner, Esq.
Texas Bar No. 24037655
S.D. Texas ID 3813191
C. Celeste Creswell (admitted *pro hac vice*)
Georgia Bar No. 196077
KABAT CHAPMAN & OZMER LLP
171 17th Street NW, Suite 1550
Atlanta, GA 30363
Tel: (404) 400-7300
Fax: (404) 400-7333
awagner@kcozlaw.com
ccreswell@kcozlaw.com

*Attorneys for Samantha Mattison*